**In re LEE WEST ENTERPRISES, INC., Debtor.**

**Bankruptcy No. SA 92–20666 JW.**

United States Bankruptcy Court,
C.D. California.

March 17, 1995.

James J. Joseph, Danning, Gill, Diamond & Kollitz, Los Angeles, CA, Chapter 7 Trustee.

David A. Gill, Sandra W. Lavigna, Danning, Gill, Diamond & Kollitz, Los Angeles, CA, for Chapter 7 Trustee.

Steven N. Bloom, Gary Owen Caris, Frandzel & Share, Los Angeles, CA, for Tokai Credit Corp.

Nicole C. Bershon, Irell & Manella, Los Angeles, CA, Cory E. Friedman, Carl J. Chiappa, Townley & Updike, New York City, for Jaguar Cars, Ferrari North America, Lotus Cars USA, and Aston Martin Lagonda of North America.

Randy Michelson, McCutchen, Doyle, Brown & Enersen, San Francisco, CA, for Land Rover North America, Inc.

William Lobel, Pamela Karger, Irvine, CA, for debtor.

## MEMORANDUM OF DECISION

JOHN J. WILSON, Bankruptcy Judge.

The Chapter 7 Trustee ("Trustee") seeks an order authorizing the assumption and assignment of certain franchise agreements between the Debtor, Lee West Enterprises, Inc. ("Debtor") and Jaguar Cars ("Jaguar"), Ferrari North America, Inc. ("Ferrari"), Aston Martin Lagonda of North America, Inc., ("Aston Martin"), Land Rover of North America, Inc., ("Land Rover"), and Lotus Cars USA, Inc., ("Lotus"). Jaguar, Ferrari, Aston Martin, Land Rover and Lotus (collectively referred to as the "Franchisors") oppose the Trustee's motion, *inter alia,* on the grounds that the Debtor's default under the franchise agreements is non-curable under 11 U.S.C. § 365.

### I. STATEMENT OF FACTS

The Debtor owned and operated automobile dealerships located in Newport Beach,

California, that sold Jaguar, Ferrari, Aston Martin, Land Rover and Lotus vehicles. The Debtor entered into the franchise agreements with Jaguar, Ferrari and Aston Martin in January of 1989. The Debtor entered into a franchise agreement with Lotus in November of 1988 and with Land Rover in May of 1991. Tokai Credit Corporation ("TCC") was the Debtor's flooring lender, holding a first priority security interest in the Debtor's assets.

The Debtor commenced a voluntary case under Chapter 11 of the Bankruptcy Code on September 29, 1992. TCC and the Debtor entered into various stipulations, wherein TCC was granted relief from the automatic stay, subject to an agreement to forbear under certain conditions. During the course of the Chapter 11 case, the Debtor operated the dealerships as a debtor-in-possession. On October 3, 1994, pursuant to a stipulation granting relief from the automatic stay, TCC's receiver took possession and control of the assets of the Debtor. Thereafter, the receiver suspended operation of the Debtor's dealerships.

On October 5, 1994, the Court converted the Debtor's Chapter 11 case to one under Chapter 7. On October 6, 1994, James J. Joseph was appointed interim Chapter 7 Trustee. On October 27, 1994, Jaguar and Ferrari filed an EX PARTE APPLICATION FOR ORDER SHORTENING TIME ON HEARING ON MOTION FOR ORDER: (1) DEEMING DEALER AGREEMENT REJECTED; OR (2) SHORTENING TIME BY WHICH TRUSTEE MAY ASSUME OR REJECT DEALER AGREEMENT; OR, ALTERNATIVELY, (3) GRANTING RELIEF FROM THE AUTOMATIC STAY TO TERMINATE DEALER AGREEMENT. Aston Martin filed a similar application on the following day, October 28, 1994. On November 8, 1994, Land Rover filed a motion for relief from the automatic stay in order to enforce its "rights of termination."

On December 5, 1994, the Trustee filed a MOTION FOR ORDER AUTHORIZING ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACT AND CONVEYANCE OF ASSETS INCLUDING CONTRACTS ("Trustee's Motion"). On December 23, 1994, Lotus joined the other Franchisors in opposing the Trustee's Motion.

The Trustee's Motion, which is joined by TCC, seeks an order authorizing the Trustee to assume the franchise agreements and to assign and convey those contracts, together with the balance of the Debtor's assets, other than the Debtor's cash, accounts receivable, leased equipment, automobiles and real property. TCC claims a security interest in all of the Debtor's assets including the Debtor's rights in the franchise agreements. The assets that the Trustee seeks to convey are part of a package that includes real property being sold by TCC. The real property was formerly owned by a related debtor and is now owned by TCC, who was the successful bidder at a foreclosure sale of the real property.

The Trustee and TCC have agreed that the estate will receive either $300,000 or 30% of the sale price that exceeds $7 million, whichever is greater. Further, if the sale is approved, TCC will provide up to $75,000 in fees and expenses of the Trustee and his professional, while if the sale is not approved, TCC will provide for up to $100,000 in fees and expenses. The Trustee estimates at least $450,000 of the sale proceeds will be allocated to the bankruptcy estate, which will ultimately be distributed to administrative and priority claimants. There appears to be insufficient sale proceeds to provide for any distribution to general unsecured creditors.

The Trustee's motion was initially heard on January 18, 1995. At the continued hearing on February 22, 1995, the Trustee conducted an auction wherein three potential buyers submitted bids. After all the bids were received, the Trustee recommended Mr. Malamut's final bid at approximately $8.75 million. Although another bidder, McGraw, made a higher bid at approximately $8.9 million, the Trustee based his recommendation on the respective financial conditions of the bidders. TCC agreed that if the sale to Mr. Malamut closed, the bankruptcy estate would receive the same as it would have under the McGraw bid.

## II. DISCUSSION

As part of the motion to assume, the Trustee proposes to cure the defaults under the franchise agreements. Section 365(b)(1) provides that:

If there has been a default in an executory contract ... of the debtor, the trustee may not assume such contract ... unless, at the time of assumption of such contract ... the trustee—

(A) cures, or provides adequate assurance that the trustee will promptly cure, such default;

The Debtor's business operations have been suspended since approximately October 4, 1994, when the receiver seized the Debtor's assets and the case was converted to Chapter 7. The Franchisors argue that the Debtor's failure to maintain the operations of the dealerships constitutes non-curable defaults such that the Trustee may not assume the franchise agreements. The Franchisors cite California Vehicle Code § 3060(a)(2) which sets forth the specific grounds upon which a franchisor may terminate or refuse to continue an existing franchise. One of the grounds specified is California Vehicle Code section 3060(a)(2) which allows for termination of the franchise based upon:

(E) Failure of the motor vehicle dealer to conduct its customary sales and service operations during its customary hours of business for seven consecutive business days, giving rise to a good faith belief on the part of the franchisor that the motor vehicle dealer is in fact going out of business, except for circumstances beyond the direct control of the motor vehicle dealer or by order of the department.

The franchise agreements contain provisions which provide for termination based upon similar grounds ("closure provisions"). Jaguar's "Dealer Agreement Standard Provisions," Article 14.5, states:

The Company and Dealer agree that the following acts are so contrary to the spirit and purpose of this Agreement as to warrant its termination:

. . . . .

(i) Failure by Dealer to conduct its sales, service and parts operations during customary business hours of the trade in Dealer's area for six (6) or more consecutive business days, unless such failure is caused by contingencies beyond the reasonable control of Dealer. . . .

Land Rover's "Dealer Agreement," [1] Article 12.3.7, provides that the agreement may be terminated on fifteen (15) days written notice to Dealer upon the occurrence of the following event:

Failure of the Dealer Premises to operate as a going concern during the normal business hours customary for automobile dealerships in the Primary Area of Responsibility for a period of seven (7) consecutive business days, so long as such failure is not due to causes enumerated in Article 14.8.

Ferrari's "Dealer Standard Provisions," paragraph 4(a), provides that:

Throughout the term of the Dealer Retail Sales and Service Agreement, Dealer shall operate its Premises during, and for not less than, the customary business hours of the trade in Dealer's surrounding community.

Aston Martin's "Dealer Agreement," paragraph 5(e), provides that: [2]

Aston Martin may also terminate this Agreement immediately without the necessity of any notice or time to cure in the event:

(i) The Dealer ceases to function as a going concern, or operate in the ordinary course of business. . . .

The Franchisors argue that the closure of the Debtor's dealership operations constitutes a "historical fact" which is incapable of being cured by the Trustee. In support of their argument, the Franchisors cite *In re Deppe*, 110 B.R. 898 (Bankr.D.Minn.1990).

---

1. Land Rover asserts that the Dealer Agreement and Letter of Intent expired by their own terms on December 31, 1994.

2. The only other Franchisor, Lotus, has filed a copy of its "Dealer Sales and Service Agreement" with the court, however the "Standard Provisions" and "Statement of Dealer Operations Requirements" are not attached.

In *Deppe,* the debtor leased an Amoco retail gasoline service station and operated it under Amoco's brand name. The premises lease provided for termination based upon a "failure by Lessee for any reason to operate the Premises for normal sales of motor fuel during normal business hours for (7) seven consecutive days. . . ." *Id.* at 900. The Federal Petroleum Marketing Practices Act ("PMPA") similarly authorized termination of a gas station franchise for "failure by the franchisee to operate the marketing premises . . . for 7 consecutive days." *Id.* at 903. The debtor terminated business on December 8, 1989, and filed under Chapter 7 on December 11, 1989. On December 12, 1989, Amoco filed a motion for relief from stay. At the preliminary hearing on December 12, 1989, only Amoco appeared. The court granted Amoco limited relief from stay to reopen the station under its own management in order to revive and preserve Amoco's goodwill; otherwise, the court continued the hearing to allow the trustee to inquire into the value to the estate of debtor's rights under the lease and franchise. At the continued hearing on February 16, 1990, the trustee had not yet made a determination as to whether it would be in the estate's interest to assume, nor had the trustee filed a motion to extend the time to assume or reject. The court granted Amoco relief from stay to serve a notice of termination of agreement, and held that the trustee was incapable of curing the breach and default. The court stated:

> The lapse in operations took place. The estate simply cannot overcome that historical fact. Neither can it deny the significance given to such a lapse under the agreements, and under the PMPA; as two courts have noted, the steady maintenance of gasoline station operations during the days and hours fixed by franchise agreements is a key goodwill value to the refiner/distributor, which is given special deference in franchise litigation involving such businesses. [Citations omitted.] The estate cannot "undo" the historical event at this point.

*Id.* at 904.

The Franchisors also cite *In re Toyota of Yonkers, Inc.,* 135 B.R. 471 (Bankr.S.D.N.Y. 1992). In *Toyota of Yonkers,* the debtor had entered into a franchise agreement with Toyota. The secured creditor terminated the debtor's floor plan financing and replevied the inventory on September 14, 1991. The debtor filed Chapter 11 on October 1, 1991. Toyota contended that for 7 consecutive days, commencing September 19, 1991, the debtor was closed in violation of the dealership agreement, with the result that Toyota could terminate the dealership agreement for "cause." Toyota, *inter alia,* sought relief from the automatic stay in order to obtain a court order confirming that the debtor's Toyota dealership agreement was terminated and that the debtor no longer held a Toyota franchise. The court stated:

> However, Toyota relies on its termination notice dated September 27, 1991, which is based on the debtor's alleged failure to operate its dealership for seven consecutive days, commencing on September 19, 1991. This is a ground for termination pursuant to New York Vehicle and Traffic Law Section 463(2)(d)(2)(ii) and Section XX(B)(1)(a) of the Toyota dealership agreement. If this default occurred, it is incapable of cure or remedy because the debtor cannot undo this historical fact. *Deppe,* 110 B.R. at 904.

> . . . . .

> Toyota . . . is free to commence an action against the debtor in this court seeking declaratory relief with respect to the alleged termination of the Toyota franchise. Therefore, relief from the automatic stay is unnecessary for this purpose.

*Id.* at 477.

Based on the foregoing, the Franchisors argue that the Debtor's failure to operate the dealership since October 4, 1994, is a "historical fact" that the Trustee "simply cannot overcome." They further argue that since the post-petition breach of the franchise agreements are factually and legally incapable of cure, the franchise agreements are incapable of being assumed by the Trustee under § 365(b)(1)(A).

The Trustee attempts to distinguish *Deppe* on the grounds that it strictly applies to the PMPA. The Court does not find the Trust-

ee's attempts persuasive. According to *Deppe,* "the primary objective of the PMPA is to protect franchisees from arbitrary and discriminatory terminations." *Deppe,* 110 B.R. at 902. However, despite the protection for franchisees envisioned by the PMPA, the *Deppe* court still held that the default under the franchise agreement was non-curable.

The *Deppe* court noted the significance that the PMPA gave to the debtor's failure to maintain operations. Under the PMPA, special deference is given to the maintenance of gasoline station operations during the days and hours fixed by the franchise agreements as a key goodwill value to the refiner/distributor. *Id.* at 904. However, the same reasoning applies to motor vehicle franchises under the California Vehicle Code. The importance of goodwill would likely take on greater significance in the context of luxury car franchises. The California Vehicle Code clearly recognizes the materiality of the franchisee's failure to maintain operations. This Court fails to find any persuasive distinction between the termination provisions of the PMPA and that of the California Vehicle Code.

The Trustee asserts that the default is not incurable merely because it is a "historical fact," and that the "closure default" can be cured by reopening and by compensating the franchisors for any economic harm they suffered as a result of the closure. To the extent the default is non-economic and not compensable, the Trustee asserts that it is not sufficiently material so as to preclude assumption. *In re Windmill Farms,* 841 F.2d 1467 (9th Cir.1988) (certain defaults were not of sufficient substance to preclude assumption of a lease). The Trustee asserts that the closure default did not occasion material or economically significant detriment to the franchisors.

In analyzing a commercial lease, the court in *In re Joshua Slocum,* 922 F.2d 1081 (3rd Cir.1990), stated:

> The bankruptcy court, working from the premise that the Denney Block is not a "shopping center," looked to case law interpreting § 365 of the Bankruptcy Code

and distilled the concepts of "materiality and economic significance." Those cases state that "the [bankruptcy] court does retain some discretion in determining that lease provisions ... may still be refused enforcement in a bankruptcy context in which there is no substantial economic detriment to the landlord shown, and in which enforcement would preclude the bankruptcy estate from realizing the intrinsic value of its assets."

*Id.* at 1092 (citations omitted).

The issue here is whether the closure defaults under the franchise agreements are of "sufficient substance" and reflect the requisite "materiality and economic significance" under *Windmill Farms* and *Joshua Slocum.* The court concludes that the Trustee's position is untenable given the closure provisions contained in the California Vehicle Code and in the franchise agreements, which clearly reflect the materiality of a dealership's failure to maintain operations. The California Vehicle Code provides that closure for seven consecutive business days may be grounds for termination, while the Jaguar franchise agreement provides for termination based on closure for only six consecutive business days. In this case, the dealerships have been closed for over 5 months, and they were closed for approximately 3 months before the Trustee's Motion was first heard.[3]

The Franchisors have strenuously argued and have produced evidence to support their contentions that they have suffered a loss in sales and goodwill, in addition to difficulties in providing authorized service to existing local customers. Jaguar has submitted evidence that it would have made an "economic profit" of approximately $230,000 per month at the Debtor's location based on historical data. Further, Jaguar arranged to have several vehicles, that had been in the process of being serviced by the Debtor, towed or trucked to other dealerships in order for the necessary service work to be completed.

Ferrari has submitted evidence that during the first month of the Debtor's closure, approximately 4 vehicles would have "in all

---

3. The court notes that the Trustee moved expeditiously to bring this motion to hearing. However the issue is not the Trustee's diligence, but rather the materiality of the breach.

likelihood" been sold, generating revenues in excess of $600,000, based on historical data. Aston Martin has submitted evidence that as of November 10, 1994, it had received three complaints from Aston Martin customers, which in one case resulted in Aston Martin arranging for the customer's vehicle to be towed, at Aston Martin's expense, and serviced at Aston Martin of Beverly Hills.

Lastly, the Trustee argues that the closure provision is an unenforceable *ipso facto* clause. Section 365(b)(2) provides that:

Paragraph 1 of this subsection does not apply to a default that is a breach of a provision relating to—

(a) the insolvency or financial condition of the debtor at any time before the closing of the case;

Further, Section 365(e)(1) provides:

Notwithstanding a provision in an executory contract or unexpired lease, or in applicable law, an executory contract or unexpired lease of the debtor may not be terminated or modified, and any right or obligation under such contract or lease may not be terminated or modified, at any time after the commencement of the case solely because of a provision in such contract or lease that is conditioned on—

(a) the insolvency or financial condition of the debtor at any time before the closing of the case;

The Trustee argues that to the extent the closure provisions contained in the franchise agreements relate to the insolvency or financial condition of the Debtor, they are invalid *ipso facto* clauses and thus the defaults would not be required to be cured in order for the franchise agreements to be assumed.

*Ipso facto* clauses are provisions in executory contracts and unexpired leases which result in a breach solely due to the financial condition or bankruptcy filing of a party. *In re Peaches Records and Tapes, Inc.,* 51 B.R. 583, 587 at n. 6 (9th Cir. BAP 1985). Here, the default is not based upon the Debtor's financial condition or the filing of bankruptcy, but rather on the closure of the dealerships' operations. The Franchisors did not invoke the closure provisions at the onset of the case or during the pendency of the Chap-

ter 11 proceedings. Accordingly, the closure provisions in the franchise agreements cannot be considered invalid *ipso facto* clauses.

## III. CONCLUSION

Based on the foregoing, the Court finds that the Debtor's failure to maintain operations of dealerships constitutes an incurable default. The Trustee's Motion is therefore denied. In light of the Court's opinion, the hearing on the Trustee's motion to assume and assign executory contracts and to convey assets, set for April 5, 1995, is hereby vacated. This memorandum of decision contains this Court's findings of fact and conclusions of law. Counsel for the Franchisors shall lodge and serve a proposed order consistent with this memorandum of decision.