**In re BANKVEST CAPITAL CORPORATION,**
Debtor.

No. 99–47760–JBR.

United States Bankruptcy Court, D. Massachusetts.

Dec. 11, 2001.

Thomas E. Shuck, Ivanjack & Lambirth, LLP, Los Angeles, CA, James H. Rollins, Holland & Knight, LLP, Atlanta, GA, John J. Monaghan, Lynne B. Nowak, Holland & Knight, LLP, Boston, MA, for BankVest Capital Corp.

Frederic D. Grant, Boston, MA, for Finova Loan Administration, Inc.

Joseph S.U. Bodoff, Boston, MA, for Eagle Insurance Company, Newark Insurance Company.

## DECISION AND ORDER ON REQUESTS FOR PAYMENT OF CURE COSTS [# 850 and # 851]

JOEL B. ROSENTHAL, Bankruptcy Judge.

This matter having come before the Court for hearing on the Request of Newark Insurance Company for Payment of Cure Costs [# 850], the Objection by Finova Loan Administration, Inc. to Statement of Cure of Newark Insurance Company[# 947] the Request of Eagle Insurance Company for Payment of Cure Costs [# 851], Inc., and the Objection by Finova Loan Administration, Inc. to Statement of Cure of Eagle Insurance Company[# 948], and after consideration of the foregoing, the memoranda of law filed by the parties, and the arguments of counsel,the Court makes the following findings and conclusions.

### The Cure Claims

Newark Insurance Company ("Newark") and Eagle Insurance Company ("Eagle", collectively with Newark, the "Claimants") filed separate but substantially similar requests for the payment of cure costs on June 15, 2001. The requests were timely as Eagle and Newark had sought and obtained clarification of the deadline for filing such claims. Newark and Eagle allege that the Debtor failed to deliver all of the leased equipment. Specifically they state that the Debtor did not deliver 20 of the 190 items it was to deliver to each Claimant. Instead "substitute loaner" items were delivered in place of those 20 items.

The Claimants allege that the breach is such that it cannot be cured. To the extent that it can be cured however, each claims damages as a result of the delivery

of the loaner items and the failure to deliver the 20 items enumerated in Schedule A to the leases. Eagle alleges total damages of $330,542.64 while Newark calculates its damages at $314,372.64. Both Claimants allege that the damages include actual damages of $88,145 consisting of additional payroll charges ($71,075); outsourced labor ($12,000); outsourced training ($2,000); and additional repair costs($3,070). In addition both seek an unspecified reduction of the lease payments for the period during which they did not have the non-delivered items.

During the bankruptcy, Finova Loan Administration, Inc. ("Finova") was authorized to administer certain commercial leases including those at issue herein and it continues in that capacity. Pursuant to the Debtor's Fifth Amended Joint Liquidating Plan of Reorganization, as modified (the "Plan"), which was confirmed by the Court, the Debtor proposed to assume and assign certain leases, including the ones at issue, although it also reserved the right to defer a final decision to reject or assume and assign, in the event a cure claim was filed, until after adjudication of the cure claim. Finova filed objections to each cure claim asking that each claim be denied in its entirety.

## Background

On or about May 27, 1999 Eagle and Newark entered into separate but substantially similar Master Equipment Lease Agreements (the "Lease Agreements") with LandVest Capital Corp. ("LandVest") and BankVest Capital Corp. (the "Debtor") whereby LandVest and the Debtor were to lease certain computer equipment to the Claimants. On or about June 29, 1999 LandVest and each of the Claimants entered into Lease Schedules that were incorporated into the master Lease Agreements. Pursuant to Lease Schedule No. 001 Eagle agreed to make 48 monthly payments of $11,940.61 per month for the rental of the equipment set forth in Schedule A to Lease Schedule No. 001. Pursuant to Lease Schedule No. 002 Newark agreed to make 48 monthly payments of $10,111.82 per month for the equipment set forth in the Schedule A attached to Lease Schedule No. 002. Both Lease Schedules No. 001 and No. 002 provided that "[t]he rental payments may change for Equipment accepted after Aug. 31, 1999." "Equipment" is defined in each of the Lease Schedules as the equipment set forth in the respective Schedules A.

LandVest or the Debtor were to obtain the leased equipment from Nortel. At the time the parties entered into the Lease Agreements, they knew that Nortel would not complete production of approximately 20 of the leased items until several months after the commencement of the lease term. Therefore the parties agreed that Nortel would provide loaner equipment in place of the not yet manufactured items.

In or about August 1999 the items were delivered with the loaner equipment delivered in place of the not yet manufactured items. On August 25, 1999 both Eagle and Newark executed Certificates of Acceptance (the "Certificates") that were signed by Philbert Nezamodeen who was the Vice President and Chief Operating Officer of Eagle and the Vice President and Treasurer of Newark. In addition Mr. Nezamodeen was also the secretary of Material Damage Adjustment Corp. which shares the same address as Eagle and Newark and which guaranteed the obligations of Eagle and Newark under their respective leases. Eagle also guaranteed Newark's obligations while Newark guaranteed Eagle's. At the hearing, Eagle and Newark's counsel argued that the claimants were forced to deliver the Certificates before the Debtor would deliver the equipment and therefore argued that the Claimants

should not be estopped from asserting the nondelivery of the 20 items which they characterize as a "substantial" portion of the leased equipment. The Court need not reach and decide the estoppel issue.

### Is the debtor required to cure these defaults in order to assume the leases?

11 U.S.C.A. § 365(b) provides in relevant part:

(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—

(A) cures, or provides adequate assurance that the trustee will promptly cure, such default;

(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C) provides adequate assurance of future performance under such contract or lease.

(2) Paragraph (1) of this subsection does not apply to a default that is a breach of a provision relating to—

(D) the satisfaction of any penalty rate or provision relating to a default arising from any failure by the debtor to perform nonmonetary obligations under the executory contract or unexpired lease.

Although none of the parties have raised the issue, Section 365(b)(2)(D) may govern this matter. There is disagreement among the courts that have interpreted this section as to whether the word "penalty" defines both the word "rate" and the phrase "provision relating to a default arising from any failure of the debtor to perform nonmonetary obligations." In other words, must the nonmonetary default arise from a penalty provision?

In *In the Matter of GP Express Airlines, Inc.*, 200 B.R. 222 (Bankr.D.Neb. 1996), the court read Section 365(b)(2)(D) "as addressing two separate issues.... [A] debtor is not required to cure or satisfy any penalty rate obligation and the debtor is not required to cure any defaults in nonmonetary obligations. The statutory term 'rate' refers to interest rate.... By definition, there is no interest accrual on a nonmonetary obligation." *Id.* at 233–34. The court did note, however, that excusing the debtor from curing pre-assumption nonmonetary defaults did not relieve it from the requirement under Section 365(b)(1)(C) of demonstrating that all obligations, including nonmonetary ones, could be met post-assumption. *Accord In re Western Pacific Airlines, Inc.*, 219 B.R. 298, 304 (Bankr.D.Colo.1998). *But see Claremont Acquisition Corp. v. General Motors Corp. (In re Claremont Acquisition Corp.)*, 113 F.3d 1029 (9th Cir.1997) (holding that the word "penalty" modifies both "rate" and "provision" and therefore debtor's failure to operate for 7 consecutive days is not a nonmonetary default that can be excused under section 365(b)(2)(D)), *aff'g on other grounds* 186 B.R. 977 (C.D.Cal.1995) (both district court and bankruptcy court interpreted Section 365(b)(2)(D) as not requiring cure of debtor's past nonmonetary default arising from failure to operate).

The plain language of Section 365(b)(2)(D) supports the *GP Express Airlines* interpretation that penalty rate obligation and a nonmonetary default are two separate types of breaches which a debtor is not required to cure prior to assumption of a contract. Therefore whether BankVest could even cure the past defaults is irrelevant if the failure to deliver the 20 items is a nonmonetary default because a cure is not required.

Common sense dictates that the failure to deliver certain items is a quintessential example of a nonmonetary default. The Debtor was not required to make any payments. Indeed the money was to flow from Eagle and Newark to the Debtor. Therefore there are no cure claims to be satisfied before assumption and assignment of the leases. At best there are only claims for whatever damages Eagle and Newark can demonstrate flowed from the delivery of loaner items in place of the scheduled items. These claims need to be addressed in the context of an evidentiary hearing at which the parties will have to introduce evidence as to the claims and defenses thereto, including the circumstances surrounding the delivery of the Certificates of Acceptance.

### Conclusion

For the foregoing reasons, the objections to the requests for cure claims [# 948] are sustained and the requests for cure claims [# 850 and # 851] are denied. The parties are free to pursue whatever claims, counterclaims, and defenses they have in a non-bankruptcy court of competent jurisdiction.