# United States Court of Appeals
## For the First Circuit

---

No. 03-9006

IN RE BANKVEST CAPITAL CORP.,
Debtor.

---

EAGLE INSURANCE COMPANY and NEWARK INSURANCE COMPANY,

Appellants,

v.

BANKVEST CAPITAL CORP.,

Appellee.

---

APPEAL FROM THE UNITED STATES BANKRUPTCY APPELLATE PANEL
FOR THE FIRST CIRCUIT

---

Before

Lynch, <u>Circuit Judge</u>,
Campbell, <u>Senior Circuit Judge</u>,
and Lipez, <u>Circuit Judge</u>.

---

Joseph S.U. Bodoff, with whom Richard P. O'Neil and Bodoff &
Slavitt LLP were on brief, for appellants.

Jay L. Gottlieb, with whom Arianna Frankl, Brown Raysman
Millstein Felder & Steiner LLP, Frederic D. Grant, Jr., and Grant
& Roddy were on brief, for appellee.

---

March 15, 2004

---

**LYNCH, Circuit Judge**.  This case presents a narrow but important question of statutory interpretation under the Bankruptcy Code:  whether 11 U.S.C. § 365(b)(2)(D) permits the debtor-in-possession to assume an unexpired lease without first curing non-monetary defaults.  The Ninth Circuit, in the only court of appeals opinion to address this question, held that non-monetary defaults must be cured before assumption.  In re Claremont Acquisition Corp., 113 F.3d 1029, 1034-35 (9th Cir. 1997).  In the proceedings below, the bankruptcy court and the Bankruptcy Appellate Panel (BAP) reached the opposite conclusion.  We disagree with the Ninth Circuit and affirm.

**I.**

For purposes of this appeal, we accept the facts as alleged by appellants.[1]  BankVest Capital Corporation, the debtor and appellee in this action, was in the business of originating, securitizing, selling, and servicing equipment leases.  On May 27, 1999, appellants Eagle Insurance Company and Newark Insurance Company entered into separate but substantially similar lease

_____

[1] This appeal arises from a special proceeding established under BankVest's confirmed Chapter 11 plan for the determination of cure costs under 11 U.S.C. § 365(b).  The bankruptcy court treated the debtor's motion in opposition to appellants' claim for cure costs essentially as a motion to dismiss, accepting appellants' allegations of fact as true for purposes of the assumption analysis under § 365.  Neither party has contested that sensible approach and we adopt it here.

-2-

agreements with BankVest.[2] BankVest agreed to lease 190 specified items of computer equipment to each of the appellants for a term of 48 months. Under the leases, Eagle and Newark were obligated to make monthly rental payments of $10,111.82 and $11,940.61, respectively. BankVest agreed to arrange for delivery of the equipment directly from Nortel, the manufacturer.

Eagle and Newark were aware, however, that Nortel would not complete production of twenty of the 190 items until several months after the start of the lease term. Those twenty items, Eagle and Newark say, collectively accounted for 60% of the entire value of the leased goods and constituted the most critical pieces of equipment. Accordingly, it was agreed that Nortel would provide appellants with substitute "loaner" equipment until those twenty items were completed and delivered.[3] Nortel delivered the leased equipment, including the substitute items, in August 1999. On August 25, Eagle and Newark executed certificates of acceptance

---

[2] The leases also named as a lessor LeaseVest Capital Corporation, a wholly owned subsidiary of BankVest. LeaseVest subsequently assigned its rights under the leases to BankVest.

[3] BankVest denies that it was a party to the loaner arrangement and questions whether that arrangement actually occurred. BankVest says that Eagle and Newark unconditionally accepted all 190 items as delivered; that they never claimed the allegedly substitute equipment was defective or inferior; and that they in fact used those twenty items for two years without complaint.

acknowledging their receipt of the leased equipment in operating condition.[4]

On December 17, 1999, before the loaner equipment could be replaced, an involuntary Chapter 11 petition was filed against BankVest in the United States Bankruptcy Court for the District of Massachusetts. BankVest did not contest the petition, and the bankruptcy court entered an order for relief on January 25, 2000. Once in bankruptcy, BankVest proposed a plan of reorganization that contemplated a gradual liquidation of its assets. After several revisions, the bankruptcy court confirmed the plan on May 31, 2001. Meanwhile, Eagle and Newark continued to use the leased computer equipment but paid no rent to BankVest, accumulating a collective arrears of approximately $1 million. That debt remains unpaid.

This appeal arises out of the provisions in BankVest's confirmed Chapter 11 plan that govern the assumption of BankVest's unexpired equipment leases. The plan provides that every equipment lease in which BankVest is the lessor shall be deemed assumed by the estate under 11 U.S.C. § 365 unless (1) the lease is specifically rejected or (2) any party to the lease files a claim for cure costs. In the event a claim for cure costs is made, the

---

[4] Eagle and Newark argued to the bankruptcy court that they were forced to sign the certificates of acceptance before Nortel actually delivered the leased equipment, so they should not be estopped from asserting a defense of non-delivery if BankVest sues to recover unpaid rent. Like the bankruptcy court, we do not reach the estoppel question.

plan permits BankVest to defer its decision whether to assume or reject the lease until the bankruptcy court determines the amount of the cure costs, if any, that the estate would be obligated to pay upon assumption.[5]  See 11 U.S.C. § 365(b)(1).

On June 15, 2001, Newark and Eagle filed timely claims for cure costs under this procedure.  They charged that BankVest had defaulted on the leases by failing to replace the loaner equipment with the final twenty items from Nortel.[6]  Further, they contended that this non-monetary default was an historical fact not

_____

[5] Specifically, paragraph 7.1 of the confirmed plan provides:

> All equipment leases, in which the Debtor is lessor, . . . shall be deemed assumed upon the Effective Date [of the plan] unless specifically rejected on or before such date . . . , or unless a claim is made on or before the Effective Date that assumption hereunder requires the Debtor to pay Cure Costs to any party to an assumed contract or lease.  In the event a claim for Cure Costs is made, the time for the Debtor to assume or reject any such contract or lease shall be extended until such time as the Bankruptcy Court enters a Final Order as to the Claimant's entitlement to Cure Costs and the amount of such Cure Costs, at which time the Debtor may determine whether to assume or reject such contract or lease.

The plan defines "Cure Costs" as "[t]hose payments and assurances required upon assumption of an executory contract or unexpired lease pursuant to 11 U.S.C. § 365(b)(1)."

[6] Newark and Eagle also argued that BankVest's failure to deliver this equipment voided the leases entirely, so that there remained nothing to assume.  The bankruptcy court did not address this issue, however, and appellants have not raised it on appeal. Accordingly, we will assume that appellants' leases are "executory contracts or unexpired leases" within the meaning of 11 U.S.C. § 365.  Cf. Gallivan v. Springfield Post Rd. Corp., 110 F.3d 848, 851 (1st Cir. 1997) (discussing the meaning of "executory").

-5-

susceptible to cure (i.e., nothing BankVest could do would remedy its historical failure to deliver the equipment on time). In the alternative, Newark and Eagle argued that if the estate were allowed to cure, they would each be entitled to damages in excess of $300,000, as well as reductions in the rent payments owed to BankVest. Finova Loan Administration, Inc., filed an objection to appellants' cure claims on behalf of the estate on August 15, 2001.[7]

Treating Finova's objection as a motion to dismiss, the bankruptcy court held a non-evidentiary hearing on November 7, 2001. On December 11, 2001, the court dismissed appellants' cure claims on a ground not raised by either party: that 11 U.S.C. § 365(b)(2)(D) permits the debtor-in-possession[8] to assume an executory contract or unexpired lease without first curing non-monetary defaults. In re BankVest Capital Corp., 270 B.R. 541, 543

---

[7] On August 6, 2001, Finova and BankVest (in its capacity as debtor-in-possession) filed a stipulation with the bankruptcy court whereby Finova assumed BankVest's responsibility to defend appellants' cure claims. Since that time, Finova itself has filed for bankruptcy protection; U.S. Bank Portfolio Services has succeeded Finova on BankVest's behalf.

[8] Section 365 speaks only of "the trustee," but in a Chapter 11 case, the debtor-in-possession enjoys all the rights and powers of the trustee. 11 U.S.C. § 1107(a). The debtor-in-possession is the "same entity which existed before the filing of the bankruptcy petition, but empowered by virtue of the Bankruptcy Code to deal with its contracts and property in a manner it could not have done absent the bankruptcy filing." NLRB v. Bildisco & Bildisco, 465 U.S. 513, 528 (1984) (internal quotation marks omitted). For brevity and convenience, this opinion refers to BankVest in its capacity as debtor-in-possession simply as "the debtor."

(Bankr. D. Mass. 2001).  Because BankVest was not in default on any monetary provision -- indeed, all of the payments under the leases flowed to BankVest, not from it -- the court held that there were no cure claims that had to be satisfied before assumption.  Id. at 544.  The BAP affirmed on the same ground.  In re BankVest Capital Corp., 290 B.R. 443, 447-48 (B.A.P. 1st Cir. 2003).  Eagle and Newark timely appealed.

## II.

This court has jurisdiction over appeals from the BAP under 28 U.S.C. § 158(d).  We review the bankruptcy court's conclusions of law de novo, with the benefit of the BAP's bankruptcy expertise but without deference to its conclusions. Fed. R. Bankr. P. 7052; In re Werthen, 329 F.3d 269, 272 (1st Cir. 2003).

## A.  Legal Background

The dispute in this case concerns what is, in effect, an exception to an exception to the usual rule under 11 U.S.C. § 365. Section 365 generally allows the trustee in bankruptcy -- or, as in this case, the debtor-in-possession -- to assume or reject any pre-petition executory contract or unexpired lease, subject to the approval of the bankruptcy court.  § 365(a); In re FBI Distrib. Corp., 330 F.3d 36, 42 (1st Cir. 2003).  This is one of the basic reorganizational tools available to debtors under the Bankruptcy Code.  "[T]he authority to reject an executory contract is vital to

-7-

the basic purpose [of] a Chapter 11 reorganization, because [it] can release the debtor's estate from burdensome obligations that can impede a successful reorganization."  NLRB v. Bildisco & Bildisco, 465 U.S. 513, 528 (1984).  Under the Code, a rejected contract is considered to have been in breach prior to the bankruptcy petition, leaving the nondebtor party to the contract with a general unsecured claim for contract damages.  11 U.S.C. §§ 365(g)(1), 502(g); FBI Distrib., 330 F.3d at 42.  If the debtor assumes a contract, however, it accepts both the burdens and the benefits of the bargain, and any liabilities incurred in the contract's postpetition performance will be treated as administrative expenses with priority status.  See 11 U.S.C. § 507(a)(1) (priority for administrative expenses); FBI Distrib., 330 F.3d at 45.  By permitting debtors to shed disadvantageous contracts but keep beneficial ones, § 365 advances one of the core purposes of the Bankruptcy Code:  "to give worthy debtors a fresh start."  In re Carp, 340 F.3d 15, 25 (1st Cir. 2003).

There are, however, a variety of restrictions on the debtor's power to assume executory contracts and unexpired leases. Most relevant to this case is § 365(b), which provides that if the debtor has defaulted on a contract prior to assumption, the debtor cannot assume that contract unless it (1) cures the default; (2) compensates the nondebtor party for any actual pecuniary losses resulting from the default; and (3) provides adequate assurance of

future performance under the contract.[9]  § 365(b)(1).  Like the
bankruptcy court, we will assume _arguendo_ that BankVest's failure
to replace the loaner equipment constituted such a default.

Yet the requirement in § 365(b)(1) that the debtor cure
defaults prior to assumption itself has exceptions.  Section
§ 365(b)(2) provides:

> (2)   Paragraph (1) of this subsection does not apply to
>       a default that is a breach of a provision relating
>       to --
>       ...
>       (D)      the satisfaction of any penalty rate or
>                provision relating to a default arising from
>                any failure by the debtor to perform
>                nonmonetary obligations under the executory
>                contract or unexpired lease.

The bankruptcy court held, and the parties do not dispute, that
BankVest's failure to deliver certain equipment is a
"quintessential example of a nonmonetary default" within the
meaning of subparagraph (2)(D).  270 B.R. at 544.  The question on
appeal is whether subparagraph (2)(D) excuses BankVest from the
obligation that it otherwise bears under paragraph (1) to cure that
default before assumption.

## B.   Interpretation of § 365(b)(2)(D)

### (1)   Plain text

As in any statutory interpretation case, we start with
the text of the statute.  _In re Hart_, 328 F.3d 45, 48 (1st Cir.

_____

[9] If cure and compensation are not feasible prior to
assumption, the debtor may provide "adequate assurance" that it
will do so promptly afterwards.  11 U.S.C. § 365(b)(1).

-9-

2003). The language of § 365(b)(2)(D) can plausibly be interpreted in at least two ways. Eagle and Newark argue that the word "penalty" in subparagraph (2)(D) describes both "rate" and "provision." On their reading, Congress intended that subparagraph to read like this:

> (D)    the satisfaction of any penalty rate[, or any penalty provision] relating to a default arising from any failure by the debtor to perform nonmonetary obligations under the executory contract or unexpired lease.

This is essentially the interpretation that the Ninth Circuit endorsed in In re Claremont Acquisition Corp., supra, and a number of bankruptcy courts have since followed suit, see, e.g., In re Williams, 299 B.R. 684, 686 (Bankr. S.D. Ga. 2003); In re New Breed Realty Enters., 278 B.R. 314, 320 (Bankr. E.D.N.Y. 2002); In re Vitanza, No. 98-19611DWS, 1998 WL 808629, at *21 n.44 (Bankr. E.D. Pa. Nov. 13, 1998).[10]

BankVest, on the other hand, argues that the word "penalty" describes only the term "rate," and that the second half of subparagraph (2)(D) creates a distinct exception for non-monetary defaults. On this view, the statute is best interpreted like this:

> (D)    the satisfaction of any penalty rate[, or any] provision relating to a default arising from any failure by the debtor to perform nonmonetary

_____

[10]    BankVest does not contend that its obligation to deliver the leased equipment was a "penalty provision."

-10-

> obligations under the executory contract or
> unexpired lease.

This is the interpretation favored by the bankruptcy court and the BAP below, as well as by the district court in the Claremont case. See In re Claremont Acquisition Corp., 186 B.R. 977, 990 (C.D. Cal. 1995); see also In re Walden Ridge Dev., LLC, 292 B.R. 58, 67 & n.2 (Bankr. D.N.J. 2003); In re W. Pac. Airlines, Inc., 219 B.R. 298, 304 (Bankr. D. Colo. 1998), rev'd on other grounds, 219 B.R. 305 (D. Colo. 1998); In re GP Express Airlines, Inc., 200 B.R. 222, 233-34 (Bankr. D. Neb. 1996).

If the plain language of the Bankruptcy Code required either of these interpretations, that would end the matter. Lamie v. United States Trustee, 124 S. Ct. 1023, 1030 (2004). But we see no textual basis for preferring appellants' interpretation to the one adopted by the bankruptcy court, which strikes us as equally consistent with the text. Nothing in the language or syntax of § 365(b)(2)(D) unambiguously requires either outcome. Indeed, we are hard-pressed to endorse any "plain meaning" argument where, as here, other federal courts have reached conflicting answers to the same question based on the same "plain" language. Compare Claremont, 113 F.3d at 1034, and Williams, 299 B.R. at 686, with BankVest, 290 B.R. at 447, and Claremont, 186 B.R. at 990.[11]

---

[11] Eagle and Newark conspicuously have not urged this court to adopt the Ninth Circuit's textual analysis. In Claremont, the Ninth Circuit concluded that construing subparagraph (2)(D) to create a distinct exception for non-monetary defaults would be

With a simple comma or two, Congress could have made its preferred interpretation clear. But the Code as written is ambiguous, so we must divine Congress's intent from other sources. See In re Weinstein, 272 F.3d 39, 48 (1st Cir. 2001) (where the Bankruptcy Code is ambiguous, courts look to "its historical context, its legislative history, and the underlying policies that animate its provisions"); In re Christo, 192 F.3d 36, 39 (1st Cir. 1999).

(2)   Legislative history

The legislative history of § 365(b)(2)(D) is not instructive. Congress inserted subparagraph (D) as part of the Bankruptcy Reform Act of 1994, Pub. L. No. 103-394, 108 Stat. 4106. Eagle and Newark place great weight on the single sentence in the legislative history of that Act that pertains to § 365(b)(2)(D):

---

"grammatically incorrect and nonsensical" because the statute becomes grammatically incoherent if one simply deletes the words "satisfaction of any penalty rate." 113 F.3d at 1034. Even if that argument were properly before us, we would reject it. The text of § 365(b)(2)(D) is awkward and ungrammatical on any reading, including the reading that appellants urge; it proves nothing to say that the statute remains syntactically flawed when whole clauses are omitted. In any event, "the task of statutory interpretation involves more than the application of syntactic and semantic rules to isolated sentences." Cablevision of Boston, Inc. v. Pub. Improvement Comm'n, 184 F.3d 88, 101 (1st Cir. 1999). The wiser methodology, and the one that we employ here, is to interpret Congress's words in light of the goals and underlying policies of the statute as a whole. Nieves-Marquez v. Puerto Rico, 353 F.3d 108, 116 (1st Cir. 2003); In re Weinstein, 272 F.3d 39, 48 (1st Cir. 2001).

Finally, section 365(b) is clarified to provide that when sought by a debtor, a lease can be cured at a nondefault rate (i.e., it would not need to pay penalty rates).

H. Rep. No. 103-835 (parenthetical in original), reprinted in 1994 U.S.C.C.A.N. 3340, 3359. From this, appellants conclude that Congress must have intended subparagraph (2)(D) to address "penalty" provisions only. The Claremont decision likewise points to this legislative history as evidence "that Congress intended only to relieve debtors of the obligation to pay penalties." 113 F.3d at 1034.

We disagree. At best, the legislative history indicates that Congress intended § 365(b)(2)(D) to free debtors from lease provisions requiring the payment of penalty rates -- something that both parties here agree that it does.[12] But subparagraph (2)(D) also refers to non-monetary defaults, and the legislative history does not indicate what Congress intended by that reference. To interpret the House Report's explanation of one clause of subparagraph (2)(D) as a limitation on the scope of a different, unmentioned clause would "overstate[] the inferences that can be drawn from an ambiguous act of legislative drafting." Martin v.

_____

[12] Even this much was not always clear, as the text of § 365(b)(2)(D) could be read, by negative implication, to require debtors to pay penalty rates arising from monetary defaults. See In re Phoenix Bus. Park Ltd. P'ship, 257 B.R. 517, 521 (Bankr. D. Ariz. 2001); Stein & Wheatly, The Impact of Cure and Reinstatement on Default Interest, 16 Am. Bankr. Inst. J. Jul./Aug. 1997, at 1. While that problem does not bear directly on the dispute in this case, it does tend to reinforce our conclusion that the text of subparagraph (2)(D) is ambiguous.

-13-

Hadix, 527 U.S. 343, 357 (1999) (refusing to limit the scope of a statute by negative implication from the legislative history). Like the statutory text, the legislative history simply offers no guidance on the question that divides the parties.

Eagle and Newark also point to pending bankruptcy reform legislation that, they say, would codify their interpretation of subparagraph (b)(2). That is both untrue and unhelpful. For several years Congress has debated versions of the so-called Bankruptcy Abuse Prevention and Consumer Protection Act. None has yet passed. The most recent version of which we are aware, introduced in February 2003 by Representative Sensenbrenner, would strike the phrase "penalty rate or provision" in § 365(b)(2)(D) and replace it with "penalty rate or penalty provision." See H.R. 975, 108th Cong. § 328(a)(1)(B) (2003). But the same bill would also amend § 365(b)(1) to relax the cure requirement for certain non-monetary defaults. See id. § 328(a)(1)(A). The most that can be gleaned from this unenacted legislation is that at least some members of Congress are aware that § 365(b)(2)(D) is a problem. It does not tell us how Congress in 1994 intended the present version of subparagraph (2)(D) to operate in cases like the one at bar.

(3) Practical implications

The best approach to interpreting §365(b)(2)(D) focuses on practical considerations of bankruptcy policy and Congress's overarching purposes in the Bankruptcy Code. The Claremont

-14-

decision has drawn sharp criticism from bankruptcy commentators, who nearly unanimously regard that case as an obstacle to the successful reorganization of many debtors in bankruptcy. See, e.g., 3 Collier on Bankruptcy § 365.05[4] (15th ed. rev. 2003) (suggesting that Claremont reflects a "questionable" reading of subparagraph (2)(D) that is inconsistent with Congress's likely intent); Weintraub, Historical Defaults and Cross-Defaults: Here a Default, There a Default, Everywhere a Default, Default, Default, 26 Cal. Bankr. J. 286, 287 (2003) (Claremont imposes a "considerable roadblock" to the assumption and assignment of valuable contracts and "can have a potentially devastating effect" on the ability of certain debtors to reorganize); Stang, Assumption of Contracts and Leases: The Obstacle of the Historical Default, 24 Cal. Bankr. J. 39, 39 (1998) ("In restricting a debtor's ability to assume contracts and leases, the Claremont court undermined an important bankruptcy tool . . . in contravention of fundamental bankruptcy precepts.").

The reasons for this criticism are evident. Many non-monetary defaults are "historical facts" that are impossible to cure after the fact -- for example, a debtor's failure to maintain leased property in a certain condition, to use leased equipment only for approved purposes, or to meet certain standards of quality

or performance.[13]  See Vitanza, 1998 WL 808629, at \*24 n.51 (most

non-monetary defaults involve unalterable historical facts).

Requiring a debtor to cure such incurable defaults is tantamount to

barring the debtor from assuming any lease or contract in which

such a default has occurred -- no matter how essential that

contract might be to the debtor's reorganization in bankruptcy.

Indeed, that is exactly what happened in several cases following

the Claremont rule.  For example, in In re Williams, supra, the

debtor was a professional truck driver who defaulted on his truck

lease, which provided that he could only use his truck in the

service of his employer.  299 B.R. at 684-85.  The bankruptcy court

ruled that the debtor's violation of that provision was an

---

[13] Of course, this depends on the definition of "cure," a term that is not defined in the Bankruptcy Code.  Some courts and commentators have argued that some or even all non-monetary defaults are curable under the Code, whether or not they are "historical facts."  See, e.g., In re Walden Ridge Dev. Corp., 292 B.R. 58, 66-67 (Bankr. D.N.J. 2003); In re Garcia, 276 B.R. 627, 639-40 (Bankr. D. Ariz. 2002); Stang, Assumption of Contracts and Leases:  The Obstacle of the Historical Default, 24 Cal. Bankr. J. 39 (1998).  The prevailing view, however, is that many non-monetary defaults -- especially those deemed "material" to the contract -- cannot meaningfully be cured in bankruptcy.  See, e.g., Claremont, 113 F.3d at 1034-35 (holding assumption barred because the debtors' default was an historical fact that could not be cured); In re Beckett, No. CIV.A. 00-5337, 2001 WL 767601, at \*5-\*6 (E.D. Pa. Jul. 5, 2001) (similar); In re GP Express Airlines, Inc., 200 B.R. 222, 233 (Bankr. D. Neb. 1996) (airline's failure to maintain contractual performance obligations was an historical, non-monetary default and impossible to cure); In re Lee West Enters., 179 B.R. 204, 208 (Bankr. C.D. Cal. 1995) (franchisee's closure for three months prior to bankruptcy petition was a non-monetary default that could not be cured); cf. 3 Collier on Bankruptcy § 365.05[4] (15th ed. rev. 2003) (referring to situations "where the trustee cannot go back in time to undo an act or omission of the debtor").

incurable historical default, then (citing <u>Claremont</u>) barred assumption of the lease under § 365, lifted the automatic stay, and allowed repossession of the debtor's truck. <u>See</u> <u>id.</u> at 686-87; <u>see also</u> <u>In re Beckett</u>, No. CIV.A. 00-5337, 2001 WL 767601, at *1, *5-*6 (E.D. Pa. Jul. 5, 2001) (permitting the debtor's eviction because the debtor could not cure her historical default on a lease provision requiring her to maintain her apartment in a "clean, orderly, and safe condition").

This cannot, in our view, be what Congress intended. To prevent a debtor from assuming a contract based on historical events that it cannot remedy undermines Congress's basic purpose in § 365: to promote "the successful rehabilitation of the business for the benefit of both the debtor and all its creditors."[14] <u>FBI Distrib.</u>, 330 F.3d at 45. This case well illustrates the force of

---

[14] Eagle and Newark argue that § 365(b)(1) reflects a different policy goal: to ensure that the nondebtor party to an executory contract receives the benefit of its bargain if it is forced to continue performance after the debtor has filed for bankruptcy. <u>See</u> <u>In re Superior Toy & Mfg. Co.</u>, 78 F.3d 1169, 1174 (7th Cir. 1996). That policy concern is a legitimate one, but it does not control here. Bankruptcy by design involves the re-ordering of debtor-creditor relationships and the adjustment of bargains negotiated under more optimistic circumstances. Neither § 365(b)(1) nor any policy reflected therein alters the broader objective of the Bankruptcy Code to "give worthy debtors a fresh start." <u>In re Carp</u>, 340 F.3d 15, 25 (1st Cir. 2003); <u>cf.</u> <u>Bildisco</u>, 465 U.S. at 527 (bankruptcy courts "must focus on the ultimate goal of Chapter 11 when considering the[] equities" under § 365). Nor is the nondebtor party to a contract that is assumed notwithstanding a non-monetary default necessarily denied the benefit of its bargain, as it is free to sue the debtor for breach of contract after assumption.

that concern. Eagle and Newark together owe BankVest approximately $1 million in unpaid rent. Yet they argued to the bankruptcy court that BankVest's failure to complete delivery of the leased equipment is an "historical fact" not susceptible to cure. 270 B.R. at 541. So rather than simply seek an offset for any pecuniary harm they may have suffered, Eagle and Newark would deny the estate all $1 million in unpaid rent by compelling BankVest to cure what they allege is incurable.[15] That is plainly inconsistent with Congress's purpose in the Bankruptcy Code to maximize the value of the estate for all creditors. Toibb v. Radloff, 501 U.S. 157, 163 (1991); In re Summit Corp., 891 F.2d 1, 5 (1st Cir. 1989); see also United States v. Shadduck, 112 F.3d 523, 531 (1st Cir. 1997) (all creditors are injured by the efforts of a single creditor to keep property out of the estate).

All of this suggests that Congress meant § 365(b)(2)(D) to excuse debtors from the obligation to cure non-monetary defaults as a condition of assumption. The text, as we have said, readily bears that interpretation. It is not inconsistent with the meager legislative history. And developments in the bankruptcy courts prior to the 1994 amendments put Congress on notice of the problem

---

[15] We do not hold that BankVest's failure to deliver the last twenty items of leased equipment was in fact an incurable default, or even that it was a default at all. We merely accept that allegation for purposes of this appeal. The parties are free to litigate the facts of the appellants' allegations on remand (and after assumption).

of irremediable non-monetary defaults. See, e.g., In re Toyota of Yonkers, Inc., 135 B.R. 471, 477 (Bankr. S.D.N.Y. 1992) (failure to operate car dealership for seven consecutive days would constitute incurable historical default); In re Deppe, 110 B.R. 898, 904 (Bankr. D. Minn. 1990) (debtor's failure to maintain constant operations at gas station constituted incurable historical default); In re Anne Cara Oil Co., Inc., 32 B.R. 643, 648 (Bankr. D. Mass. 1983) (gas station lessee's commingling of gasoline products was likely an incurable non-monetary default that would bar assumption).

This interpretation is also consistent with the remaining subparagraphs in § 365(b)(2), which are directed to so-called ipso facto clauses (for instance, contract provisions that force debtors into default merely for becoming insolvent or seeking bankruptcy protection). See § 365(b)(2)(A)-(C). Like defaults based on breaches of ipso facto clauses, non-monetary defaults are often a product of the debtor's very financial distress. In Claremont itself, for example, the non-monetary default that prevented the debtors from assuming their franchise agreement was their decision to close their automobile dealership for the two weeks immediately prior to their bankruptcy petition. Id. So in the end, they were denied a valuable asset in their Chapter 11 reorganization because the same financial hardship that drove them into bankruptcy also forced them to default on their dealership agreement. This, we

-19-

conclude, is among the _ipso facto_ harms that Congress intended § 365(b)(2)(D) to prevent.[16]  _Cf._ Weintraub, _supra_, at 292 n.20 (noting the similar interests served in § 365(b)(2)(D) by barring the enforcement of penalty rates and by preventing historical non-monetary defaults from automatically precluding assumption).

Eagle and Newark assert that subparagraph (2)(D) cannot apply to all non-monetary defaults because that interpretation would render the _ipso facto_ default provisions superfluous.  _See_ _Claremont_, 113 F.3d at 1034 (endorsing this argument).  We disagree.  The _ipso facto_ defaults described in subparagraphs (A)-(C) are not _necessarily_ non-monetary.  For example, a breach of a provision relating to "the financial condition of the debtor" might well be monetary in nature, depending on the underlying contract. Subparagraph (2)(D) is not so "wholly superfluous" as to preclude what we consider to be its most sensible interpretation.  _Conn._ _Nat'l Bank_ v. _Germain_, 503 U.S. 249, 253 (1992).  There may be substantial overlap among the provisions of § 365(b)(2), but redundancy is not the same as surplusage.  _See_ _Germain_, 503 U.S. at

---

[16] Non-monetary contractual obligations are similar to the _ipso facto_ provisions in § 365(b)(2)(A)-(C) in another respect:  the likelihood of default is under the control of the parties.  This creates the risk that a potential creditor can effectively "bankruptcy-proof" its contract with a financially troubled company by making the deal contingent on the achievement of stringent performance or quality benchmarks.  One recognized purpose of the _ipso facto_ clauses in § 365(b)(2) is to prevent creditors from opting out of the bankruptcy process in this manner.  _See generally_ Collier on Bankruptcy, _supra_, at § 365.05[4].

-20-

253 ("Redundancies across statutes are not unusual events in drafting, and so long as there is no positive repugnancy between two laws . . . a court must give effect to both." (internal citation and quotation marks omitted)).

## C.  Application of § 365(b)(2)(D)

We hold that under § 365(b)(2)(D), BankVest need not cure non-monetary defaults before assuming its equipment leases with Eagle and Newark.  This clears the way for BankVest to assume the leases (subject to the approval of the bankruptcy court) and to file an action to collect the $1 million in outstanding rent.  And in that action, Eagle and Newark may raise their defenses to payment and may counterclaim for damages for any losses actually suffered through BankVest's alleged breach.  "[I]t seems that Congress's intent in enacting [§ 365(b)(2)(D)] was to address just such a situation, that is, where the trustee cannot go back in time to undo an act or omission of the debtor but could compensate for any actual pecuniary loss that the other contracting party suffered as a result of the default."  Collier on Bankruptcy, supra, § 365.05[4] (criticizing Claremont).  We emphasize, however, that the assumption proceeding itself is not the place to resolve those issues.  See In re Orion Pictures Corp., 4 F.3d 1095, 1098-99 (2d Cir. 1993) ("At heart, a motion to assume should be considered a summary proceeding, intended to efficiently review the trustee's or debtor's decision to adhere to or reject a particular contract in

the course of the swift administration of the bankruptcy estate. It is not the time or place for prolonged discovery or a lengthy trial with disputed issues."); In re Docktor Pet Ctr., Inc., 144 B.R. 14, 16 (Bankr. D. Mass. 1992).  As the BAP concluded, "[i]f a debtor wants to assume [a contract] in its business judgment, knowing that issues other than payment due may be litigated after assumption, the debtor should be allowed to do so."  290 B.R. at 448.

**III.**

The judgment of the Bankruptcy Appellate Panel is **<u>affirmed</u>**.