# United States Court of Appeals
## For the First Circuit

---

No. 20-1685

IN RE: THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO
RICO, as Representative for the Commonwealth of Puerto Rico; THE
FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as
Representative for the Puerto Rico Highways and Transportation
Authority; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR
PUERTO RICO, as Representative for the Puerto Rico Electric
Power Authority (PREPA); THE FINANCIAL OVERSIGHT AND MANAGEMENT
BOARD FOR PUERTO RICO, as Representative for the Puerto Rico
Sales Tax Financing Corporation, a/k/a Cofina; THE FINANCIAL
OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as
Representative for the Employees Retirement System of the
Government of the Commonwealth of Puerto Rico; THE FINANCIAL
OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as
Representative for the Puerto Rico Public Buildings Authority,

Debtors.

---

CAMPAMENTO CONTRA LAS CENIZAS EN PENUELAS, INC.; ALIANZA
COMUNITARIA AMBIENTALISTA DE SURESTE, INC.; AMIGOS DEL RIO
GUAYNABO, INC.; CAMBIO P.R.; COALICION DE ORGANIZACIONES ANTI-
INCINERACION, INC.; COMITE YABUCOENO PRO-CALIDAD DE VIDA, INC.;
COMITE DIALOGO AMBIENTAL, INC.; EL PUENTE DE WILLIAMSBURG, INC.,
Enlace Latino de Accion Climatica; SIERRA CLUB PUERTO RICO,
INC.; MAYAGUEZANOS POR LA SALUD Y EL AMBIENTE, INC.,

Interested Parties, Appellants,

v.

THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as
Representative for the Commonwealth of Puerto Rico; THE
FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as
Representative for the Puerto Rico Electric Power Authority
(PREPA),

Debtors, Appellees.

---

No. 20-1709

IN RE: THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as Representative for the Commonwealth of Puerto Rico; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as Representative for the Puerto Rico Highways and Transportation Authority; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as Representative for the Puerto Rico Electric Power Authority (PREPA); THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as Representative for the Puerto Rico Sales Tax Financing Corporation, a/k/a Cofina; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as Representative for the Employees Retirement System of the Government of the Commonwealth of Puerto Rico; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as Representative for the Puerto Rico Public Buildings Authority,

Debtors.

_____

UNION DE TRABAJADORES DE LA INDUSTRIA ELECTRICA Y RIEGO (UTIER),

Interested Party, Appellant,

v.

THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as Representative for the Commonwealth of Puerto Rico; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as Representative for the Puerto Rico Electric Power Authority (PREPA),

Debtors, Appellees.

_____

No. 20-1710

IN RE: THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as Representative for the Commonwealth of Puerto Rico; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as Representative for the Puerto Rico Highways and Transportation Authority; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as Representative for the Puerto Rico Electric Power Authority (PREPA); THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as Representative for the Puerto Rico Sales Tax Financing Corporation, a/k/a Cofina; THE FINANCIAL

OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as Representative for the Employees Retirement System of the Government of the Commonwealth of Puerto Rico; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as Representative for the Puerto Rico Public Buildings Authority,

Debtors.

———————————

WINDMAR RENEWABLE ENERGY, INC.,

Interested Party, Appellant,

v.

THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as Representative for the Commonwealth of Puerto Rico; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as Representative for the Puerto Rico Electric Power Authority (PREPA),

Debtors, Appellees.

———————————

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Laura Taylor Swain,* U.S. District Judge]

———————————

Before

Lynch and Kayatta, Circuit Judges,
and Woodcock,** District Judge.

———————————

Jessica E. Méndez Colberg, with whom Rolando Emmanuelli Jiménez and Bufete Emmanuelli, C.S.P., were on brief, for appellant UTIER.
Fernando E. Agrait for appellant Windmar Renewable Energy, Inc.
Daniel Desatnik, with whom Martin J. Bienenstock, Mark D. Harris, Paul V. Possinger, Ehud Barak, Timothy W. Mungovan, John

—————————————

* Of the Southern District of New York, sitting by designation.

** Of the District of Maine, sitting by designation.

E. Roberts, Adam L. Deming, and Proskauer Rose LLP were on brief, for appellees.

—————————————

August 12, 2021

—————————————

**KAYATTA**, **Circuit Judge**.  This PROMESA case turns on the Financial Oversight and Management Board's authority to assume certain long-term power supply contracts on behalf of the Puerto Rico Electric Power Authority (PREPA) under 11 U.S.C. § 365 and 48 U.S.C. § 2161.  The appellants -- PREPA's primary labor union, an energy company that has other contracts with PREPA, and several environmental groups -- contend that the Board abused section 365's assumption procedure to avoid the competitive bidding process ordinarily required for such contracts under Commonwealth law.  The Title III court disagreed and granted the Board's motion to assume the contracts.  We affirm.

**I.**

Electricity satisfying approximately forty percent of Puerto Rico's baseload power demand comes from PREPA's "LNG-to-Power Program," under which liquefied natural gas (LNG) is imported and converted into power generation capacity (or energy, for short).  Before 2019, the LNG-to-Power program depended in relevant part on two PREPA contracts:  (1) a 1995 power purchase and operating agreement (PPOA) with EcoEléctrica, the owner and operator of a power plant in Peñuelas, Puerto Rico, and (2) a 2012 gas sale and purchase agreement (GSPA) with Naturgy, a natural gas provider that is also a majority shareholder in EcoEléctrica.  Under the 1995 PPOA, EcoEléctrica purchased natural gas, converted it into energy in the Peñuelas power plant, and sold the final

product to PREPA.  Under the 2012 GSPA, Naturgy sold natural gas directly to PREPA, which would then convert it into energy in a PREPA-owned power plant known as Costa Sur.  At some point, Naturgy began selling natural gas to EcoEléctrica as well, presumably pursuant to a separately negotiated agreement.[1]

In 2017, the Board filed a bankruptcy petition on PREPA's behalf under Title III of PROMESA.  See In re Fin. Oversight & Mgmt. Bd., 899 F.3d 13, 18 (1st Cir. 2018).  As part of the debt restructuring process, the Board certified fiscal plans in 2018 and 2019 that contemplated the renegotiation of both the PPOA and the GSPA.  In view of those fiscal plans, and mindful that the contracts were set to expire in March 2022 and December 2020, respectively, PREPA separately initiated negotiations with EcoEléctrica and Naturgy to amend the terms of each contract.  An outside consultant assisted PREPA throughout the negotiations by analyzing the likely results of several potential strategies.

By March 2020, PREPA had successfully renegotiated both the PPOA and the GSPA.  The renegotiated PPOA provided that PREPA (not EcoEléctrica) would purchase natural gas on the front end and supply it to EcoEléctrica, which would then convert it into energy

---

[1] The record on appeal does not include copies of the original Naturgy GSPA or the original ECO PPOA.  As such, we rely on a consultant's report, which the parties treat as accurate, to describe the terms of the original contracts, their differences from the terms of the renegotiated contracts, and the circumstances surrounding the renegotiated contracts.

for PREPA. The renegotiated GSPA expanded the original GSPA so that Naturgy would sell PREPA enough gas to supply both PREPA's Costa Sur plant and EcoEléctrica's Peñuelas plant (rather than just the Costa Sur plant). Both contracts were extended until September 2032, and both were executed subject to several conditions precedent.

One of the conditions included in the renegotiated PPOA and GSPA was that the Puerto Rico Energy Bureau (PREB) approve the terms of the agreements. PREPA accordingly sought PREB's regulatory approval of the renegotiated GSPA and PPOA, which PREB granted in March 2020. Windmar Renewable Energy, a power company that has other PPOAs with PREPA, sought to intervene in the PREB proceeding and moved for reconsideration of PREB's approval decision. Similar motions were also filed by the labor union representing most of PREPA's employees, Unión de Trabajadores de la Industria Eléctrica y Riego, Inc. (UTIER), and a number of environmental groups. As of the date this appeal was argued, PREB had not yet decided the motions for reconsideration. Nor have the parties advised us of any subsequent decision.

The other condition precedent relevant here required that the Title III court enter an order allowing PREPA to assume the renegotiated PPOA and GSPA. See 11 U.S.C. § 365(a) (providing that a trustee may choose to either "assume or reject" certain contracts with the court's approval); 48 U.S.C. § 2161(a)

(incorporating 11 U.S.C. § 365 into PROMESA). Choosing whether to assume or reject a contract under section 365(a) is "one of the basic reorganizational tools available to debtors under the Bankruptcy Code." In re BankVest Cap. Corp., 360 F.3d 291, 296 (1st Cir. 2004). Assumption "accepts both the burdens and the benefits of the bargain, and any liabilities incurred in the contract's postpetition performance will be treated as administrative expenses with priority status." Id. Rejection "release[s] the debtor's estate from burdensome obligations that can impede a successful reorganization," leaving creditors with a general unsecured claim for contract damages. Id. (quoting NLRB v. Bildisco & Bildisco, 465 U.S. 513, 528 (1984)).

In an effort to satisfy this condition, the Board moved on PREPA's behalf to assume the PPOA and GSPA in April 2020 (after PREPA had secured PREB's approval, pending resolution of the motions for reconsideration and any subsequent appeal). Windmar and UTIER, both unsecured creditors of PREPA, objected to the Board's motion, possibly fearing that assumption of the contracts would divert funds from the pot available to be shared by unsecured creditors. The following environmental groups also objected: Alianza Comunitaria Ambientalista del Sureste, Inc.; Amigos de Río Guaynabo, Inc.; CAMBIO PR, Inc.; Campamento Contra las Cenizas en Peñuelas, Inc.; Coalición de Organizaciones Anti-Incineración, Inc.; Comité Diálogo Ambiental, Inc.; Comité Yabucoeño Pro-Calidad

de Vida, Inc.; El Puente de Williamsburg, Inc.-Enlace Latino de Acción Climática; Mayagüezanos por la Salud y el Ambiente, Inc.; and Sierra Club Puerto Rico, Inc. Among other things, the objectors argued that the Board's motion to assume was premature, that the GSPA and PPOA were post-petition contracts not eligible for assumption under 11 U.S.C. § 365(a), and that the contracts were not in the best interest of PREPA or of the public. The Title III court rejected these arguments and granted the Board's motion to assume. The objectors appealed.[2]

## II.

We begin by addressing a threshold issue of jurisdiction and justiciability: UTIER and Windmar's argument that the Board's motion to assume was not ripe for judicial resolution. "[R]ipeness doctrine seeks to prevent the adjudication of claims relating to 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" Reddy v. Foster, 845 F.3d 493, 500 (1st Cir. 2017) (quoting Texas v. United States, 523 U.S. 296, 300 (1998)). Ripeness analysis focuses on two factors: "fitness" and "hardship." N.H. Lottery Comm'n v. Rosen, 986 F.3d 38, 52 (1st Cir. 2021) (quoting Reddy, 845 F.3d at 501). "Fitness involves

---

[2] On appeal, the environmental groups adopted the arguments made in UTIER's opening brief and did not file anything further. All subsequent references to arguments by UTIER should therefore be understood as referring to arguments by both UTIER and the environmental groups.

- 9 -

issues of 'finality, definiteness, and the extent to which resolution of the challenge depends upon facts that may not yet be sufficiently developed,' while hardship 'typically turns upon whether the challenged action creates a direct and immediate dilemma for the parties.'"   Id. at 53 (quoting R.I. Ass'n of Realtors, Inc. v. Whitehouse, 199 F.3d 26, 33 (1st Cir. 1999)).

Focusing on fitness first, UTIER and Windmar assert that the Board's motion to assume is unripe because it depends on contingent future events.  Their argument proceeds in five steps: (1) The agreements are conditioned on PREB's approval; (2) that approval must be final before the condition can be satisfied; (3) PREB's March 2020 approval order is not yet final because several motions for reconsideration remain pending, and appeals to the courts of the Commonwealth will likely follow; (4) there is no way to predict the results of those proceedings, making it impossible to know whether or when PREB's March 2020 approval order will become final; and (5) as such, the Board prematurely moved to assume the contracts.

UTIER and Windmar's argument fails at the second step. It is true that "obtaining approval of . . . PREB" is a "condition[] precedent" to the renegotiated GSPA and PPOA taking effect.  But nothing in the text of the agreements expressly indicates that an order of approval by PREB only qualifies as "approval of . . . PREB" within the meaning of the contracts after

all opportunities for appellate review have been exhausted. And the Board, which speaks on behalf of PREPA, represents in its brief that the parties to the agreements did not intend to impose such a finality condition. Because UTIER and Windmar identify no evidence to the contrary, we reject their contention that a condition precedent to the contracts was unsatisfied and that the Board's motion to assume those contracts was therefore unfit for judicial resolution.[3]

Putting the terms of the contracts aside, UTIER asserts that the Title III court's standing procedural order independently required PREB's order approving the contracts to be final and unappealable before the Board could seek assumption. But the procedural order provides only that PREPA obtain "to the extent required, the consent and approval of [PREB]" before the Board may file a motion to assume a PPOA. The order does not provide guidance as to when such approval is "required," nor does it specify that such approval must be "final," i.e., no longer subject to appellate review. Indeed, by granting the motion to assume in this case, the Title III court implicitly rejected reading such a finality requirement into its procedural order. We see no error in that determination. Moreover, even if the Board had violated the

---

[3] Accordingly, we need not and do not decide whether the Board's motion to assume would have been ripe (or whether the contracts would have been eligible for assumption) if we had found that a condition precedent was unfulfilled.

- 11 -

procedural order by filing its motion to assume before PREB's approval was final, that violation would go to the timeliness of the motion, not its fitness for judicial resolution.

UTIER and Windmar object that, as a matter of comity, the motion to assume should not be resolved until all issues of Commonwealth law arising out of the PREB proceeding are finally adjudicated, given that the same issues arise in this proceeding. But appellants can point to no instance in which the Title III court's assumption ruling has tied the hands of PREB. Nor is such an occurrence likely. In considering a motion to assume under section 365(a), "a bankruptcy court sits as an overseer of the wisdom with which the bankruptcy estate's property is being managed by the trustee or debtor-in-possession, and not, as it does in other circumstances, as the arbiter of disputes between creditors and the estate." In re Orion Pictures Corp., 4 F.3d 1095, 1099 (2d Cir. 1993). As such, any decision on the merits of the Board's motion to assume the renegotiated GSPA and PPOA is "[i]n no way . . . a formal ruling" on legal issues related to the contracts. Id. Moreover, as a matter of practical comity, one suspects that PREB would benefit from knowing sooner rather than later whether the Title III court would allow assumption. We therefore reject UTIER and Windmar's contention that PREB's

ongoing review process inherently renders the Board's motion to assume unfit for judicial resolution.[4]

As for the hardship prong of ripeness analysis, we have little trouble concluding that delaying resolution of the motion to assume would "create[] a direct and immediate dilemma" for PREPA, its creditors, and the public. R.I. Ass'n of Realtors, 199 F.3d at 33 (quoting Ernst & Young v. Depositors Econ. Prot. Corp., 45 F.3d 530, 535 (1st Cir. 1995)). The original GSPA and PPOA were set to expire in December 2020 and March 2022, respectively, and the renegotiated GSPA and PPOA were conditioned on the Board's assumption of the contracts. If the motion to assume had not been resolved promptly, the original GSPA almost certainly would have lapsed, jeopardizing PREPA's ability to maintain up to forty percent of Puerto Rico's baseload power supply. In short, the Board's motion to assume was ripe for resolution by the Title III court and remains so on appeal.

---

[4] For the same reasons, we reject Windmar's argument that procedural irregularities in PREB's process preclude consideration of the Board's motion. We also reject Windmar's argument that the motion to assume is not fit for judicial resolution because the COVID-19 pandemic created uncertainty about the stability of the Puerto Rican economy, calling into question the "future [of] Puerto Rico, in general, and PREPA, in particular." This criticism bears on the wisdom of the agreements, not on the ripeness of the Board's motion to assume them.

We now turn to UTIER and Windmar's claim that the Title III court erred in granting the Board's motion to assume the renegotiated contracts. The appellants' arguments center on the proper application of 11 U.S.C. § 365(a), which provides that, with some exceptions not relevant here, "the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." See 48 U.S.C. § 2161(a) (incorporating 11 U.S.C. § 365 into PROMESA). We review the Title III court's factual findings for clear error and its conclusions of law de novo. See Colón-Torres v. Negrón-Fernández, 997 F.3d 63, 68 (1st Cir. 2021).

**A.**

UTIER and Windmar's principal challenge rests on two propositions: (1) The GSPA and PPOA, as renegotiated, are entirely new, post-petition agreements; and (2) entirely new, post-petition contracts may not be assumed under section 365(a).

We begin by noting what is not at issue: UTIER and Windmar do not argue that merely amending a contract renders it unassumable. See Richmond Leasing Co. v. Cap. Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985) ("Nothing in the Code suggests that the debtor may not modify its contracts when all parties to the contract consent."); accord City of Covington v. Covington Landing Ltd. P'ship, 71 F.3d 1221, 1227 (6th Cir. 1995); see also

- 14 -

In re Ionosphere Clubs, Inc., 85 F.3d 992, 1001–02 (2d Cir. 1996) (indicating that a debtor may negotiate modifications to an executory contract, including a reduction in its overall monetary obligation, before moving to assume the contract); Josiah M. Daniel III, Lawyering on Behalf of the Non-Debtor Party in Anticipation, and During the Course, of an Executory Contract Counterparty's Chapter 11 Bankruptcy Case, 14 Hous. Bus. & Tax L.J. 230, 250–51 (2014) (stating that "the debtor and the other party may, subject to court approval, agree to amend an executory contract that the debtor then assumes").

Rather, UTIER and Windmar contend that the renegotiated contracts were unassumable because they novated, i.e., extinguished and replaced, the original agreements. Under the Civil Code of Puerto Rico, which the parties agree applies here, a contractual modification is an extinctive novation only if it is "expressly declared" as such or if "the old and new [obligations are] incompatible in all points." P.R. Laws Ann. tit. 31, § 3242. Whether a novation has occurred is a question of the parties' intent, and "novation is never presumed." Warner Lambert Co. v. Superior Court, 1 P.R. Offic. Trans. 527, 544 (1973). Rather, it "must be established without any trace of doubt." Id. Applying these standards, the Title III court determined as a matter of contract interpretation that the renegotiated contracts did not novate the original agreements. We review that legal determination

- 15 -

de novo.  See Autoridad de Energía Eléctrica v. Ericsson Inc., 201 F.3d 15, 18 (1st Cir. 2000); Colón-Torres, 997 F.3d at 68.

Here, as the district court found, the renegotiated contracts expressly declare an intent to "amend[] and restate[]" the original agreements, not to extinguish them.  So UTIER and Windmar are reduced to arguing that the renegotiated agreements are so incompatible with the original agreements that we must disregard the parties' stated purpose and infer an intent to novate.  To prevail on this uphill argument, UTIER and Windmar must show that the language of the contracts and the circumstances surrounding the agreements reveal "such a radical change in the nature of the new obligation[s] with respect to the old one[s], that both cannot coexist for being mutually exclusive."  Goble & Jimenez, Inc. v. Doré Rice Mill, Inc., 8 P.R. Offic. Trans. 90, 95 (1978).

UTIER and Windmar have not made such a showing with respect to either the GSPA or the PPOA.  Under the original GSPA, Naturgy supplied fuel to PREPA's Costa Sur plant.  The renegotiated Naturgy GSPA expands the original agreement so that Naturgy supplies fuel to PREPA for use in EcoEléctrica's Peñuelas plant as well.  Under the renegotiated contract, "[t]he original relation remains untouched," and Naturgy "continues performing the same transactions assigned to [it]" as before the contract was amended. Goble, 8 P.R. Offic. Trans. at 96.  The only difference is that

Naturgy must provide more fuel to PREPA than previously contemplated. Such a quantitative change does not operate as a novation under Commonwealth law. See id. (finding no novation where a distribution contract was expanded to cover new products and new territories); see also FDIC v. P.L.M. Int'l, Inc., 834 F.2d 248, 251 (1st Cir. 1987) (holding that the addition of new obligations of the same type did not extinguish previous obligations because the new agreement "complement[ed] and buil[t] upon" the earlier agreements). For the same reasons, UTIER and Windmar cannot establish a novation by pointing to the quantitative amendments made to the GSPA's pricing and hedge formulas, the minimum and maximum contract quantities, and PREPA's take-or-pay obligations.

The PPOA presents an arguably closer question, but the post-petition amendments made to that contract still fall well short of establishing a novation. Under the original PPOA, EcoEléctrica purchased its own fuel from Naturgy and converted it into energy for PREPA to distribute to consumers. PREPA, in turn, reimbursed EcoEléctrica for fuel expenses and paid EcoEléctrica for the costs of conversion. Under the renegotiated PPOA, PREPA purchases fuel directly from Naturgy and pays EcoEléctrica for converting it into energy. As such, the renegotiated agreement technically makes PREPA a supplier to EcoEléctrica, creating a relationship not envisioned by the prior agreement and changing

the structure of services provided and payments received by EcoEléctrica. But this change makes little practical difference: Even under the renegotiated agreement, Naturgy delivers fuel directly to EcoEléctrica, just as it did previously. And EcoEléctrica converts that fuel into energy for PREPA as before. See Goble, 8 P.R. Offic. Trans. at 91 (explaining that "the surrounding circumstances at the moment the agreements between the parties were reached" are relevant to determining whether the parties had the "will to novate"). The only material change is the point at which PREPA pays for the fuel provided by Naturgy. We do not think this is the sort of "radical change," id. at 95, that indicates an intent to novate "without any trace of doubt," Warner Lambert Co., 1 P.R. Offic. Trans. at 544.

UTIER asserts that EcoEléctrica previously purchased fuel from other suppliers, not just Naturgy, and contends that the renegotiated PPOA therefore novated the original contract. However, UTIER points to no evidence in the record supporting this contention. Even if UTIER is correct on this point, it makes no dispositive difference. Under the original PPOA, EcoEléctrica would have been free to obtain fuel from any supplier, including PREPA and/or Naturgy. The renegotiated PPOA therefore requires only that EcoEléctrica obtain fuel from a supplier it could have been using all along. We see no mutual exclusivity between

EcoEléctrica's obligations under the original PPOA and those under the renegotiated PPOA.

UTIER and Windmar nevertheless maintain that PREPA intended to novate the original GSPA and PPOA, pointing to certain statements allegedly made by PREPA that the renegotiated contracts were "new" or "substantially amended." Such shorthand, informal characterizations cannot overcome an analysis of the contractual obligations themselves. That analysis turns on the compatibility of old and new obligations, not on whether a contract that has been substantially amended is in some sense "new." And while this reasoning by itself disposes of any argument based on the statements to which UTIER and Windmar point, we can add belt to suspenders because the exhibits containing these statements were never admitted into the district court record. As such, the statements are not properly part of the record on appeal, see Fed. R. App. P. 6(b)(2)(B), and need not be considered, see Amoah v. McKinney, 875 F.3d 60, 61 (1st Cir. 2017) (affirming summary judgment "based on the record that remained" after the district court properly struck certain statements). For each of these reasons, we reject UTIER and Windmar's contention that PREPA has admitted an intent to novate the original contracts.

UTIER finally contends that we should treat the renegotiated GSPA and PPOA as "entirely new," rather than as amended versions of the original contracts, because the

- 19 -

renegotiated contracts could not become effective "until the District Court enter[ed] an order approving assumption." But adopting this reasoning would bar debtors from negotiating amendments to pre-petition contracts as a quid pro quo for assumption. UTIER offers no reason to erect such a bar, and none occurs to us. In sum, we reject all of UTIER's and Windmar's contentions that the renegotiated contracts were brand new contracts that, as such, could not be assumed.

**B.**

The only remaining question is whether the Title III court properly granted the Board's motion to assume the renegotiated contracts under the customary standards of section 365(a). Bankruptcy courts "generally approve" motions brought under section 365(a) under the "deferential 'business judgment' rule." Mission Prod. Holdings, Inc. v. Tempnology, LLC, 139 S. Ct. 1652, 1658 (2019) (quoting Bildisco, 465 U.S. at 523). UTIER and Windmar argue that the business-judgment rule does not properly apply to PREPA's motion to assume and that, even if the business-judgment rule applies, the Title III court erred in approving the motion. We address these arguments in turn.

**1.**

UTIER and Windmar first contend that a higher standard ought to apply given the federal interests at stake and the public importance of the contracts at issue. They primarily rely on NLRB

v. Bildisco & Bildisco, which imposed a heightened standard on employers' motions to reject collective bargaining agreements. 465 U.S. at 524, 526-27. Specifically, the Bildisco Court held that collective bargaining agreements could not be rejected unless "reasonable efforts to negotiate a voluntary modification ha[d] been made and [were] not likely to produce a prompt and satisfactory solution." Id. at 526. Recognizing that employers in bankruptcy had no enforceable duty to bargain in good faith with unions under the National Labor Relations Act (NLRA), id. at 533 (citing 29 U.S.C. § 158(a)(5)), the Court found that this "reasonable efforts" requirement was necessary to avoid undermining the NLRA's "policies of avoiding labor strife and encouraging collective bargaining," id. at 526 (citing 29 U.S.C. § 151). The Court also reasoned that "because of the special nature of a collective-bargaining contract, and the consequent 'law of the shop' which it creates," id. at 524, bankruptcy courts considering motions to reject collective bargaining agreements must "balanc[e] the interests of the affected parties," including the debtor, creditors, and employees, as they "relate to the success of the reorganization," id. at 527.

Analogizing to Bildisco, one court of appeals has imposed a heightened balance-of-equities standard on motions to reject an energy contract under section 365(a), see In re FirstEnergy Sols. Corp., 945 F.3d 431, 454 (6th Cir. 2019), and

- 21 -

another has contemplated doing the same, see In re Mirant Corp., 378 F.3d 511, 525 (5th Cir. 2004). Both cases were limited to the "unique" context of contracts "for the interstate sale of electricity" that had been filed with the Federal Energy Regulatory Commission (FERC) pursuant to the Federal Power Act, 16 U.S.C. § 824. In re FirstEnergy Sols., 945 F.3d at 453 (quoting In re Mirant Corp., 378 F.3d at 525). Because obligations under such "filed contracts" can be changed or abrogated outside the bankruptcy context only upon a finding by FERC that the contracts "seriously harm[] the public interest," id. at 443-44, the courts in both cases indicated that applying the deferential business-judgment rule to a rejection motion would threaten the policies underlying the Federal Power Act, see id. at 454; In re Mirant Corp., 378 F.3d at 525.

UTIER and Windmar assert that the PPOA and GSPA are likewise governed by federal law, pointing to certain provisions of the Federal Power Act, 16 U.S.C. § 824, and the Natural Gas Act of 1938, 15 U.S.C. § 717(a). As such, they say, the higher balance-of-equities standard should apply to the Board's motion to assume those contracts as well. But Bildisco, In re FirstEnergy Solutions, and In re Mirant Corp. concerned motions to reject, not assume, contracts. In each case, allowing rejection of the contracts under the deferential business-judgment standard necessarily would have undermined the federal laws and policies

- 22 -

that otherwise governed the contracts. Nothing in those cases suggests that a motion to assume a preexisting contract poses a symmetrical need for heightened scrutiny. Far from it: Had the debtors in Bildisco, In re FirstEnergy Solutions, or In re Mirant Corp. sought to assume the contracts at issue, the federal regulatory framework under which the contracts were originally negotiated would have been affirmatively furthered, rather than undermined.

The fact that PREPA agreed with its contractual counterparts to amend the PPOA and GSPA before assuming them does not change the result. Indeed, the Court in Bildisco expressly endorsed "voluntary modification[s]" to preexisting contracts as a desirable alternative to rejection motions, given the importance of good-faith negotiations between employers and unions under the NLRA. 465 U.S. at 526. Perhaps In re FirstEnergy Solutions and In re Mirant Corp. can be read to suggest that a motion to assume an amended contract might be subject to heightened scrutiny if the original contracts were filed with FERC. See In re FirstEnergy Sols., 945 F.3d at 443-44 (explaining that any change to filed rates must be approved by FERC); In re Mirant Corp., 378 F.3d at 525 (same). But UTIER and Windmar do not suggest that the original GSPA or PPOA were filed with FERC, nor that PREPA would need to seek FERC's approval to renegotiate them in ordinary course. They simply assert, without any supporting factual or legal analysis,

- 23 -

that the "underlying policies" of the Federal Power Act and Natural Gas Act are relevant to the contracts at issue.

Another factual distinction removes this case even further from Bildisco and its progeny. Part of what drove the results in Bildisco, In re First Energy Solutions, and In re Mirant Corp. was that the relevant regulatory agencies in those cases lacked authority to take independent action to enforce the federal laws implicated by the rejection motions. See Bildisco, 465 U.S. at 532-33; In re First Energy Sols., 945 F.3d at 445-46, 453-54; In re Mirant Corp., 378 F.3d at 522, 525. Thus, it was in no way redundant to consider those agencies' concerns in resolving the rejection motions in those cases; rather, as discussed above, such review was necessary to ensure that important federal policies were not disregarded in bankruptcy. Here, by contrast, the amended GSPA and PPOA that the Board seeks to assume are subject to review by PREB, the Commonwealth agency that exercises regulatory authority over such contracts. We see no need to deviate from the business-judgment rule in order to duplicate the same type of review that PREB has undertaken. Indeed, doing so might raise the comity concerns cited by UTIER and Windmar above. As Windmar recognizes, "it is PREB who makes the [balance-of-equities] judgment."

- 24 -

**2.**

We turn finally to the question of whether the Title III court clearly erred in finding that the renegotiated agreements were an exercise of sound business judgment by PREPA. See, e.g., In re Pomona Valley Med. Grp., Inc., 476 F.3d 665, 670 (9th Cir. 2007) (explaining that applications of the business-judgment rule are reviewable under the clearly erroneous standard because they "involve questions of fact"). Courts have articulated the business-judgment rule differently. Some require the debtor to persuade the court that assumption will benefit the estate. See In re UAL Corp., 635 F.3d 312, 319 (7th Cir. 2011); In re Orion Pictures, 4 F.3d at 1099. Others summarily approve motions to assume unless the debtor's rationale for assumption is so unreasonable as to suggest bad faith. See In re Pomona Valley, 476 F.3d at 670; Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc., 756 F.2d 1043, 1047 (4th Cir. 1985), abrogated on other grounds as recognized by Mission Prod. Holdings, 139 S. Ct. at 1664.

We need not decide which of these formulations is precisely correct because the Board's motion to assume the renegotiated PPOA and GSPA would satisfy either of them. As the district court found based on a report prepared by PREPA's consultant, the renegotiated contracts would result in $81 million in annual savings for PREPA over five years, exceeding the savings

targets contemplated by the 2019 fiscal plan certified by the Board. We see no clear error in this factual finding, and it plainly establishes that assumption of the contracts is a reasonable business decision likely to benefit PREPA.

UTIER asserts that assumption harms its members and other unsecured creditors of PREPA by granting administrative expense priority to post-petition liabilities arising out of the renegotiated GSPA and PPOA. See In re FBI Distrib. Corp., 330 F.3d 36, 42 (1st Cir. 2003). According to UTIER, the better course would have been to continue performing the original GSPA and PPOA and to negotiate new contracts effective upon their expiration. However, as the Board argues, liabilities arising under both the old and new contracts in that hypothetical scenario would also be eligible for administrative expense priority. See id. at 42-43 (explaining the different standards for granting priority to post-petition expenses incurred pursuant to assumed pre-petition contracts and those incurred pursuant to unassumed pre-petition contracts); In re Malden Mills Indus., Inc., 303 B.R. 688, 706 (B.A.P. 1st Cir. 2004) (explaining that liabilities incurred pursuant to post-petition contracts can be treated as administrative expenses if they benefited the estate); see also In re Klein Sleep Prods., Inc., 78 F.3d 18, 25 (2d Cir. 1996) (expressing the view that the business-judgment standard under 11 U.S.C. § 365(a) and the test for granting administrative expense

priority to post-petition liabilities under 11 U.S.C. § 503(b) are substantially equivalent).

UTIER next argues that the renegotiated GSPA and PPOA are not beneficial because PREPA could have obtained an even better deal with EcoEléctrica. However, as the Title III court recognized, the business-judgment rule does not ask whether the debtor has made the best possible business decision. See In re Fin. Oversight & Mgmt. Bd., 618 B.R. 349, 361 (D.P.R. 2020) (citing In re Old Carco LLC, 406 B.R. 180, 196 (Bankr. S.D.N.Y. 2009)). Rather, it asks at most whether the debtor's estate will benefit from assumption of the relevant contracts.

UTIER and Windmar fall back on the argument that the GSPA and PPOA cannot be considered the products of sound business judgment because the agreements are unlawful as amended. Specifically, they argue that the renegotiation process violated the Commonwealth law requiring competitive bidding for public contracts and that the contracts violate federal and Commonwealth antitrust laws by granting Naturgy an unlawful monopoly over the natural gas market in Puerto Rico. We are not persuaded. The fact that a course of action poses some non-zero risk cannot by itself mean that a decision to take such an action must fail scrutiny under the business-judgment rule. See In re BH S & B Holdings LLC, 420 B.R. 112, 146 (Bankr. S.D.N.Y. 2009) ("The business judgment rule exists precisely to ensure that directors

and managers acting in good faith may pursue risky strategies that seem to promise great profit." (quoting Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P., 906 A.2d 168, 194 (Del. Ch. 2006))), aff'd as modified, 807 F. Supp. 2d 199 (S.D.N.Y. 2011).  Otherwise, most courses of action would be precluded, given how few would be risk-free.

Thus, for example, a corporation may adopt a potentially invalid contract if, in the exercise of business judgment, it determines that the benefits of the contract outweigh the risk that the contract will later be found unenforceable.  Cf. In re Orion Pictures, 4 F.3d at 1099 (explaining that a bankruptcy court may validly grant a motion to assume if, as a matter of business judgment, "the court thinks it unlikely that [another] court would hold that the debtor had breached the contract"); In re Infotechnology, Inc., 89 F.3d 825 (2d Cir. 1995) (unpublished decision) (finding that a settlement was a sound exercise of business judgment because it depended in relevant part on predictions about the likely outcome of potential future legal proceedings that were supported by existing precedent).

Here, UTIER and Windmar offer no reason to think that the risk they have identified was so great that it rendered the Board's decision necessarily unreasonable, let alone that the Title III court's finding to the contrary was clearly erroneous. They have not identified a single case invalidating a public

utility contract under either the Commonwealth's competitive bidding law or the antitrust statutes they rely on. Cf. United States v. Gonzalez, 949 F.3d 30, 39 (1st Cir. 2020) (requiring "on-point authority" to establish "clear or obvious error" in the plain-error context). Moreover, as the district court noted, PREPA obtained permission and approval from a number of local and federal authorities throughout the negotiation process, and the agreements themselves are conditioned on the preparation of legal opinions as to their lawfulness. As such, we have little doubt that PREPA's agreement to the terms of the renegotiated GSPA and PPOA was a valid business judgment.

Finally, UTIER and Windmar object that Naturgy used its monopoly over the natural gas market in Puerto Rico to "strong-arm[]" PREPA into agreeing to the renegotiated terms, resulting in "an overpayment of billions of dollars" by PREPA. In other words, UTIER and Windmar assert that if there were more competition in Puerto Rico's natural gas market, PREPA could have negotiated even better terms for the amended GSPA and PPOA. But, as we have already explained, a hypothetical better option does not negate the Board's concrete showing that the renegotiated contracts stand to benefit PREPA. We therefore see no clear error in the Title III court's finding that the renegotiated GSPA and PPOA were the products of sound business judgment by PREPA.

**IV.**

For the foregoing reasons, we <u>affirm</u> the judgment of the Title III court.